UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARK ABRAMS,
              Plaintiff,

  -against-

BLOOMBERG, L.P.; ADAM
GOLDSMITH, Individually; and MAX
LINNINGTON, Individually,
              Defendants.
----------------------------------------------------------X

JUDGE BATTS

09 CV 6537

Case No:

COMPLAINT

JURY TRIAL DEMANDED

COMES NOW Plaintiff, Mark Abrams ("Plaintiff" or "Abrams"), by and through his undersigned attorneys, The Law Offices of Neal Brickman, P.C., 317 Madison Avenue, 21st Floor, New York, New York 10017, and as and for his Complaint against Defendants, Bloomberg, L.P. ("Bloomberg"), Adam Goldsmith ("Goldsmith") and Max Linnington ("Linnington") (collectively, "Defendants"), states and alleges the following:

## STATEMENT PURSUANT TO LOCAL CIVIL RULE 1.9

1. Mark Abrams is an individual citizen of The United States of America and, as such, has no interests or subsidiaries that need to be disclosed.

## NATURE OF ACTION

2. Plaintiff is a former employee of Bloomberg, L.P., and fifty years of age. This is an action for damages arising from Defendant's illegal discriminatory treatment of Plaintiff, on the bases, inter alia, of age and retaliation, under the Age Discrimination in Employment Act of 1967 ("ADSA"), 29 U.S.C. § 621, as amended; the Family Medical Leave Act ("FMLA"); the New York Executive Law ("NYEL") § 296 et seq.; and New York City Administrative Code ("NYCAC") § 8-107 et seq.; as well as various additional state and common law causes of

action, for which Plaintiff seeks the award of compensatory and punitive damages, together with the costs of this action, including his reasonable attorneys' fees.

## JURISDICTION AND VENUE

3. Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of The United States; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b)(1) because the Defendants reside in this judicial district, and (b)(2) because the acts giving rise to Mr. Abram's claims took place in New York City, and Mr. Abrams suffered injury in the State of New York.

## THE PARTIES

5. Mark Abrams is a fifty year old male citizen of The United States with his primary residence at 1 Daymond Terrace in Larchmont, New York 10538.

6. Bloomberg, L.P. is a financial software, news and data company, incorporated under the laws of the State of Delaware. Bloomberg has its principal place of business and headquarters at 731 Lexington Avenue in the City of New York 10022.

7. Upon information and belief, at all times relevant hereto, defendant Adam Goldsmith was an individual citizen of The United States and an officer of Bloomberg who had supervisory authority over Mr. Abrams during the last years of his employment. Goldsmith qualifies as an "employer" for purposes of individual liability under NYEL § 296 and NYCAC § 8-107 and § 8-502 because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under NYEL § 296 by virtue of his ability to

affect the terms and conditions of Mr. Abrams' employment.

8.  Upon information and belief, at all times relevant hereto, defendant Max Linnington was an individual citizen of The United States and an officer of Bloomberg who had supervisory authority over Mr. Abrams. Linnington qualifies as an "employer" for purposes of individual liability under NYEL § 296 and NYCAC § 8-107 and § 8-502 because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under NYEL § 296 by virtue of his ability to affect the terms and conditions of Mr. Abrams' employment.

## FACTUAL BACKGROUND

9.  Plaintiff was hired by Bloomberg on or about July 22, 2002 to be a Product Strategy Specialist in Electronic Trading as a part of Bloomberg's Product Strategy Group. Reflecting his many qualifications and years of experience, Abrams was given the salary of $125,000.00 per annum. His compensation scheme also included over 100 Equity Equivalence Certificates ("EECs"), which are typically payable two years after issue, with the exception of a new employees' first EECs, whose certificates are payable one year after issue.

10. Abrams was 43 years old at the time he was hired by Bloomberg.

11. Abrams was employed in the above-mentioned role, the role for which he was hired, for only nine (9) weeks. On or about September 18, 2002, Bloomberg's Product Strategy Group was disbanded.

12. Abrams was subsequently reassigned to the North American Sales department under Max Linnington, a group which was predominantly under the age of 40 and had less than 10% of its staff at Mr. Abrams' age or older.

13.     For Abrams' 2002-2003 annual review, Bloomberg management signed documents certifying that Abrams was rated a "3," on an internal performance rating system, on a scale of "1" through "5" where "1" is the highest receivable score, identifying Abrams as meeting and/or exceeding expectations for the review period. Notably, and in contravention of the strictures of the companies own written policies, this was Abrams' first review, in spite of his having requested a 6 month review as per Company policy. In hindsight, Linnington's actions in deliberate disregard for the Company's written policies as they related to Abrams in this instance were a precursor to his later actions.

14.     Significantly, as one of the topics covered in the annual six months review was the amount of two year EECs were to be awarded, Abrams was denied the opportunity to address the reduction of his initial EEC award of approximately 116 EECs per annum to 50 at the time he finally received his 6 month review which was ultimately, and routinely thereafter under Linnington, presented only in conjunction with his annual review.

15.     Despite his favorable rating, in 2003 Abrams was moved out of his sales position. Abrams was transferred out of the North American Sales department and into the Trading Systems Group ("TSG"), a position which, according to Linnington, necessitated an approximate three (3) to six (6) month period at the trading systems help desk in order to learn the product. Abrams agreed to the transfer on the condition that he would have a New York based sales role. Linnington specifically agreed to this condition.

16.     However, Linnington reneged, and Abrams was relegated to the trading systems help desk for more than eighteen (18) months, three times the accepted residency for new

employees of the TSG. Abrams repeatedly lobbied to be put back into his rightful role as a salesperson but was repeatedly denied even as younger, less qualified individuals were so placed.

17. Similarly situated younger employees did not have their careers stalled in such a manner. Similarly situated younger employees were not precluded from advancement within Defendants' organization. The organizational bias against older employees was clearly apparent and manifested by Linnington's disparate treatment of Abrams, the oldest member of the group.

18. In March 2005, Abrams was finally moved into a sales role in TSG.

19. In June 2005, Abrams was forced to take a medical leave of absence in order to undergo knee-replacement surgery.

20. In July 2005, while he was away on leave recovering from surgery, Abrams' EEC compensation was slashed by more than 25%. Defendants attempted to justify this discriminatory action by claiming Abrams was a poor performer, a notion clearly refuted by Abrams' performance reviews and his quantifiable results, when viewed objectively.

21. Abrams returned from medical leave in September 2005. Upon his return, he was assigned tasks related to Bloomberg's Database Delete Project ("DDP"), which focused on selling to clients who had historically refused to pay for Bloomberg's Trading System software, making it one of the toughest sales projects in Bloomberg L.P. This assignment was one in which Defendants set Abrams up to fail. Achieving any sales on this group was known to be near impossible as other sales people with established relationships had already demonstrated. To make the circumstance worse, Abrams was only provided with potential accounts which were passed on by other sales associates. Presumably, the other salespeople gave up their worst, not

best, accounts. In that position, he was given, what was thought by Defendants to be, an unattainable sales quota.

22. Nevertheless, Abrams achieved 425% of his sales quota in December 2005 through April 2006 in that role. Abrams was clearly a hard-working employee whose performance reviews, as well as his concrete results with his area of expertise clearly document his accomplishments and value as an employee.

23. Similarly situated younger employees who had not gone on medical leave did not have their compensation cut and were not essentially demoted without a legitimate basis, as Abrams was.

24. Despite exceeding the sales quota given to him for the DDP of $160,000.00, reaching, in fact, a sales figure of $880,000.00 for a six (6) month period after returning from FMLA leave, Abrams was denied any additional compensation under the supposed "meritocracy" of Bloomberg, wherein bonuses were substituted for commissions. Abrams was denied even the standard cost-of-living pay increase. Similarly situated younger employees were not denied merited bonuses or denied compensation for similar results or, upon information and belief, even substantially less successful results.

25. In fact, even in the face of his obvious sales talent and contributions to Bloomberg, in retaliation for his taking of medical leave and complaints about fair treatment but in concert with the Corporate strategy of disparate treatment foisted upon older employees to coerce their resignations, Abrams was given an overwhelmingly negative performance review in June 2006 by his manager, Adam Goldsmith. Goldsmith cited a supposed inability to work as part of a team as the reason for the negative review.

26. In response to this review, two of Abrams' former supervisors came forward to dispute these false assertions, one specifically mentioning that Abrams was, in fact, a team player.

27. Having the support of his former supervisors, Abrams demanded a retraction of his negative 2006 review. After a thorough, and more objective review of the situation, in November 2006 Bloomberg Human Resources revised Abrams' performance review to one that was much more positive, less negative, although still not fully accurate in its portrayal of Abrams.

28. Despite these distractions, Abrams continued to be a high performer for the trading systems group. From July 2006 through July 2007, his accomplishments included, but were not limited to sales of trading systems and numerous terminals, as well as increases in users and functionality for such systems and terminals, involving, but certainly not limited to, First Albany, Commerce Capital, Royal Bank of Scotland/Greenwich Capital, BCP Securities and CRT. These accomplishments, as well as his call and visit numbers, were well in excess of those achieved by most of the other members of the group. Demonstrative of his recognized successes was a Bloomberg sponsored team award earned by Abrams for the best introduction of Bloomberg functionality during the Fall of 2006.

29. In or before November 2006, Abrams lodged a formal complaint of age discrimination, citing primarily the admittedly false review which was eventually retracted as well as the abject and baseless denial, or even explanation for, the denial, of fair compensation for work performed during 2005 and thereafter. Despite his persistent requests, Bloomberg never made any attempt to justify the disparate treatment and lack of fair compensation, much less to

correct the compensation that had been denied to Abrams. While Human Resources was aware of all of his successes and the ongoing disparate treatment, no one from that area -- even after the filing of specific complaints of discrimination, much less before -- took any action to intervene to mitigate, much less halt the discrimination, disparate treatment and/or increasing retaliation.

30. Abrams also requested a transfer in November 2006 in part due to frustration over the lack of recognition for his accomplishments, as well as concerns about additional retribution from the manager who had contrived a falsely negative review of him.

31. Despite his ongoing successes, Abrams was told that he would have to seek out open positions within Bloomberg and apply to them, in the same manner as an applicant from outside Bloomberg.

32. Abrams duly applied for various positions, including a business manager opportunity in Bloomberg's Evaluations Group and as a Fixed Income Application Specialist in a group run by Tom Nelson. After hearing of his application, Mr. Nelson informed Abrams that he was "not a fit" for any of the positions[1].

33. Tellingly, when Bloomberg discriminated on the basis of age it routinely utilized the euphemism, "not a fit" to describe older applicants.

34. During this same time, Abrams was listed -- and successfully completed all relevant duties -- as the account manager for more than nine firms; maintained call and visit

---

[1] In an Affidavit recounting instances of age discrimination at Bloomberg which was given in April 2006 by Matthew Brown, a Bloomberg Human Resources employee, Brown specifically addresses the usage of "not a fit" as a virtual "coded" transcription for "too old." As an example, Mr. Brown recounts a well-qualified and enthusiastic job applicant, who was, "in his mid-thirties or early forties, who said that he would take any salary offered." Mr. Brown's supervisor, Lori Oliveri, told Mr. Brown that this applicant also was "not a fit" despite the applicant's being a clearly prudent choice of candidate.

numbers in excess of his peer group; increased functionality for Sovereign Securities, Commerce Capital, Boenning and Scattergood, CRT, Millenium Partners and First Albany; and orchestrated additional sales and commitments, including the sale of a TOMS database to Depfa Bank.

35.     At the same time, Abrams also applied for positions in data sales after learning that were as many as five (5) posted openings in Data Sales, positions for which, based on his years of experience and his proven sales ability, he was exceptionally qualified.

36.     Thereafter and through May of 2007, Curtis McCool, a senior manager in Data Sales, sent messages to Abrams that he would be in touch with Abrams about the Data Sales positions, but he eventually filled the positions with younger, objectively less qualified candidates who had far less experience in the field. When McCool substantively responded to Abrams, Abrams was informed that he had to talk to Linnington about the potential positions.

37.     In the interim and thereafter, Abrams' manager continued to discriminate and retaliate against him, requiring, among other items of petty harassment and retaliation, that Abrams submit expense reports that actually violated the company's stated policy which prohibited submission of reimbursement slips for *de minimis* amounts, and holding Abrams to a tedious and ridiculous standard all while continuously criticizing Abrams for contrived deficiencies in the execution of his duties.

38.     After learning in or about late May that he needed to speak with Linnington about the transfer possibility, Abrams immediately attempted to speak with Linnington, who repeatedly delayed speaking with Abrams. In an ongoing attempt to mitigate the deleterious effects on his career of the Defendants' discriminatory acts, Abrams reiterated his requests for a transfer, eventually leading to a meeting with Linnington on or about August 1, 2007. Based upon

information and belief, Linnington, as a senior-level executive, had management authority over all sales at Bloomberg. Linnington falsely told Abrams that he could not be transferred because -- despite his objectively outstanding sales performance, the revision of the patently false and retaliatory performance review and the unequivocal support of his former managers -- he allegedly was not an employee "in good standing". At that time, Abrams reiterated his complaints of discrimination to Linnington.

39. Subsequent to his renewed complaints of age discrimination, Abrams was demoted to a position on a help desk, from which he was precluded from using his demonstrated sales acumen; denied any meaningful opportunity for advancement; and left with nominal duties or responsibilities.

40. Unlike his previous assignment on the trading systems help desk, this position did not even maintain a pretense of being an educational outpost required to learn about a product, nor was it intended by Bloomberg to be temporary. It was a move apparently designed simply to marginalize Abrams in direct retaliation for his complaints about discrimination.

41. Stripped of virtually all meaningful duties and assignments, demoted to an obscure position not remotely commensurate with his experience and abilities and dehabilitated from the consistent discrimination he faced, Abrams made Bloomberg aware that he considered their latest discrimination and retaliation clear grounds to assert a constructive discharge.

42. On or about September 30, 2007, Abrams was forced from the company as a direct result of the discrimination, retaliation and harassment that he had been subjected to be Defendants. The terms and conditions of Abrams' employment at this time would have led a reasonable person objectively to conclude that the Defendants wanted him to leave and were

terminating him, especially as they had precluded any possibility of advancement; precluded him from practicing as a salesman which was his trade in which he had been remarkably successful both before and during his employment with Defendants; and shunted him into a position for which he had been given inadequate training, as well as repeatedly cut his compensation and denied him equal pay and treatment as younger employees.

43. After Abrams filed a charge with the EEOC on or about November 29, 2007, the EEOC granted Abrams a Right to Sue letter dated April 27, 2009 (A copy of the right to Sue letter is annexed hereto as Exhibit "A").

## AS AND FOR A FIRST CAUSE OF ACTION
(Discrimination in contravention of the ADEA as against Bloomberg)

44. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "43" of this Complaint with the same force and effect as if fully set forth herein at length.

45. Because of his age, Abrams was treated differently than similarly situated younger employees. For example, he was left on the trading systems help desk for more than three times the accepted length of time when, based on demonstrable fact, it clearly would have been more profitable for Bloomberg to have Mr. Abrams in a sales position, as well as more lucrative for Abrams.

46. Similarly situated younger employees were not precluded from advancement and were not hindered in their ability to earn nor denied their proper compensation under an allegedly meritorious system. Similarly situated younger employees (a) did not receive contrived, falsely negative reviews; (b) were not harassed or deliberately micro-managed by their managers; (c)

were not placed in jobs for which they had virtually no training; (d) were not placed in jobs having only nominal actual duties or responsibilities; (e) were not stripped of the primary elements of their chosen career and then current job functions; (f) were not deprived of the opportunity to maintain their sales accounts; (g) were not forced to implement a buy-side system without adequate training (despite the fact that others had such experience, but had less experience in sales, positions that were given to such younger employees but denied to Abrams); (h) were not forced out of their chosen role within the Company and the role for which they had been hired; and (i) were not constructively discharged; all as Abrams was treated by Defendants.

47. The Defendants' actions resulting in, inter alia, disparate treatment of Abrams based on his age, constitute illegal, discriminatory treatment, and have caused Abrams economic injury and harm.

WHEREFORE, Abrams respectfully demands judgment against Bloomberg for compensatory damages in an amount to be determined at trial, but in no event less than Six Hundred Forty Thousand Dollars ($640,000.00); punitive damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00); the costs and disbursements of this action (including his reasonable attorneys' fees); and any such other and further relief to Mr. Abrams as this Court deems just, fair, and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
(Retaliation in contravention of the ADEA as against Bloomberg)

48. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "47" of this Complaint with the same force and effect as if fully set forth herein at length.

49. Mr. Abrams' complaints of discrimination directly resulted in the marginalization of his career, his demotion, his transfer to a help desk, for no legitimate or non-discriminatory discernable purpose and without even the pretense of having to learn a product. The Defendants abrogated Abrams' opportunity to perform meaningful work because of these complaints, relegating him to a position vastly inferior to his experience and proven ability and cut his compensation, even while allowing younger, less-qualifies employees who had not complained of discrimination to proceed unhindered in their careers.

50. Subsequent to his complaints of discrimination, Mr. Abrams was the victim of harassment; was hindered in his search for a transfer; was denied positions that were logical fits for him; was falsely told that no positions were available and that he was not an employee in "good standing"; was placed in jobs for which he had virtually no training and without any material actual duties or responsibilities; and was constructively discharged.

51. These actions are bald-faced examples of retaliation, have caused injury and harm to Mr. Abrams and, as such, warrant the assessment of punitive damages.

WHEREFORE, Abrams respectfully demands judgment against Bloomberg for compensatory damages in an amount to be determined at trial, but in no event less than Six Hundred Forty Thousand Dollars ($640,000.00); punitive damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00); the costs and disbursements of this action (including his reasonable attorneys' fees); and any such other and further relief to Mr. Abrams as this Court deems just, fair, and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
(Discrimination in violation of FMLA as against Bloomberg)

52.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "51" of this Complaint with the same force and effect as if fully set forth herein at length.

53.     Similarly situated employees who did not go on medical leave did not have their compensation slashed -- based on flimsy pretexts. No attempt was made to restore Mr. Abrams' compensation upon his return. Instead, when Mr. Abrams returned from his necessary and FMLA-approved leave, he was moved out of the traditional sales position he had waited 18 months for and then only presented with an "opportunity" that Defendants proffered with the intent that he would fail. Defendants further hedged their bets by allowing the existing sales force to cull their weakest clients and provided only those to Abrams. Abrams nevertheless ultimately succeeded. He effectively had been demoted and denied any *bona fide* opportunity for advancement -- opportunity that existed for Abrams before his medical leave.

54.     The Defendants' conduct is in direct contravention of the FMLA and as a direct and proximate cause of material harm to Mr. Abrams.

WHEREFORE, Mr. Abrams respectfully demands judgment against Bloomberg for compensatory and punitive damages in an amount to be determined at trial, but in no event less than Six Hundred Forty Thousand Dollars ($640,000.00); the costs and disbursements of this action (including his reasonable attorneys' fees); and any such other and further relief to Mr. Abrams as this Court deems just, fair, and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Discrimination in violation of NYEL § 296 et seq. and NYCAC § 8-502 et seq. as against all Defendants)

55. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "54" of this Complaint with the same force and effect as if fully set forth herein at length.

56. NYEC § 296 and NYCAC § 8-502 preclude discrimination in employment on the basis of age.

57. The Defendants treated Abrams differently than similarly situated younger employees. Abrams' age motivated Defendants to act in an unfair and illegal manner with regards to Abrams, causing him harm.

58. Abrams has been harassed, his career has been stalled and hindered, his earnings have been impaired, and he has been repeatedly denied the same opportunities, the same equitable work environment, and the same fair chance to perform given to similarly situated younger employees. Such younger employees were not placed in jobs for which they had nominal training, placed in jobs having negligible actual duties or responsibilities and were not constructively discharged; among other acts of disparate treatment.

59. Goldsmith and Linnington not only were responsible for the direct supervision of Abrams, but also specifically effected or directed the demotions, the limitations on his career, the disparate treatment of Abrams vis-à-vis younger similarly situated employees and the ongoing discriminatory harassment of Abrams.

60. The Defendants' conduct has, at all times, been knowing and intentional, and warrants the assessment of punitive damages.

WHEREFORE, Abrams respectfully demands judgment against Bloomberg for compensatory damages in an amount to be determined at trial, but in no event less than Six Hundred Forty Thousand Dollars ($640,000.00); punitive damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00); the costs and disbursements of this action (including his reasonable attorneys' fees); and any such other and further relief to Mr. Abrams as this Court deems just, fair, and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Retaliation in violation of NYEL § 296 et seq. and NYCAC § 8-502 et seq. as against all Defendants)

61. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "60" of this Complaint with the same force and effect as if fully set forth herein at length.

62. NYEC § 296 and NYCAC § 8-502 prohibit retaliation in employment against an employee for making allegations of discrimination, inter alia, based on age.

63. Because Abrams filed complaints of discrimination he was harassed, subjected to compensation cuts, held to standards that violate Bloomberg policy, falsely informed that he was not in good standing, was placed in jobs for which he had negligible training and without any material actual duties or responsibilities, was prevented from transferring into a position which might be a better environment for him, and ultimately forced into a position that was absurd given his experience and ability, all in a singular effort to punish him and force him out of the Company for his complaints.

64. After Abrams complained about discrimination in light of the receipt of a demonstrably and unsupportable review among other acts of discrimination and disparate

treatment, Defendants were compelled to make some corrections to the review, but then began to retaliate against Abrams in earnest; this despite the fact that the negative aspects of the "Review" were refuted by Abrams' prior managers, his prior recommendations within Bloomberg and his undeniable performance in the area of his expertise for which he was hired, namely sales. Abrams was then taken from his sales position; treated as a non-employee when requesting a transfer; lied to about the availability of alternative employment opportunities; and forced into a dead-end job that not only had no future at Bloomberg, but would have had a materially detrimental effect on Abrams ability to have any career in sales thereafter.

65.     No intervening acts constituting a justifiable basis for the adverse employment decisions suffered by Abrams occurred between his complaints of discrimination and the adverse employment actions designed to derail his career and, ultimately, effect his constructive discharge.

66.     The Defendants' illegal retaliatory conduct against Abrams has directly resulted in harm and injury to Abrams and, as such, warrants the assessment of punitive damages.

WHEREFORE, Abrams respectfully demands judgment against Bloomberg for compensatory damages in an amount to be determined at trial, but in no event less than Six Hundred Forty Thousand Dollars ($640,000.00); punitive damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00); the costs and disbursements of this action (including his reasonable attorneys' fees); and any such other and further relief to Mr. Abrams as this Court deems just, fair, and proper.

## JURY DEMAND

67. Plaintiff hereby demands a trial by jury, pursuant to Fed. R. Civ. P., Rule 38(b).

Dated: New York, New York
July 21, 2009

                              Respectfully submitted,

                              THE LAW OFFICES OF NEAL BRICKMAN, P.C.

By: _/s/ Neal Brickman_____
Neal Brickman (NB 0874)
Ethan Leonard (EL2497)
317 Madison Avenue, 21st Floor
New York, New York 10017
Telephone:     (212) 986-6840
Facsimile:     (212) 986-7691
Email:          neal@brickmanlaw.com

**Exhibit A**

EEOC Form 161 (2/08)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| **To:** Mark Abrams<br>1 Daymond Terrace<br>Larchmont, NY 10538 | **From:** New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2008-00606 | V. Guest, Investigator | (212) 336-3620 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

APR 2 7 2009

*(Date Mailed)*

Enclosures(s)

cc: **BLOOMBERG L P**
Director, Human Resources
731 Lexington Avenue
New York, NY 10022

Neal Brickman, Esq.
The Law Offices of Neal Brickman, P.C
317 Madison Avenue, 21st Floor
New York, NY 10017